**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **JACQUELINE BROWN** | § | **C.A. NO. _____** |
| | § | |
| | § | |
| | § | |
| **VS.** | § | |
| | § | |
| | § | |
| | § | |
| **GENERAL MOTORS, LLC** | § | **JURY TRIAL DEMANDED** |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, JACQUELINE BROWN; ("Plaintiff"), brings this action against GENERAL MOTORS LLC; and/or its related subsidiaries, successors, or affiliates ("GM").

## INTRODUCTION

1.       This case involves serious and permanent personal injuries that were suffered by the Plaintiff as the result of an egregious and unprecedented failure to disclose and actively conceal a known defect in GM vehicles.

2.       An auto manufacturer should never make profits more important than safety and should never conceal defects that exist in its vehicles from consumers or the public. GM's Vehicle Safety Chief, Jeff Boyer has stated that: "Nothing is more important than the safety of our customers in the vehicles they drive." Yet GM failed to live up to this commitment.

3.       The first priority of a car manufacturer should be to ensure that its vehicles are safe, and particularly that its vehicles have operable ignition systems, airbags, power-

steering, power brakes, and other safety features that can prevent or minimize the threat of death or serious bodily harm in a collision.  In addition, a car manufacturer must take all reasonable steps to ensure that, once a vehicle is running, it operates safely and its critical safety systems (such as engine control, braking, and airbag systems) work properly until such time as the driver shuts the vehicle down.

4.     Moreover, a manufacturer that is aware of dangerous design defects that cause its vehicles to shut down during operation, or the vehicles' airbags not to deploy, must promptly disclose and remedy such defects.

## BACKGROUND

5.     Since at least 2000, GM has sold millions of vehicles throughout the United States and worldwide that have a safety defect in which the vehicle's ignition switch can inadvertently move from the "run" position to the "accessory" or "off" position during ordinary driving conditions, resulting in a loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to deploy.

6.     There are at least two main reasons why the GM ignition switch systems are defective.  The first is that the ignition switch is simply weak and therefore does not hold the key in place in the "run" position.  On information and belief, the ignition switch weakness is due to a defective part known as a "detent plunger."

7.     The second reason that the ignition switch systems are defective is due to the low position of the switches in the GM vehicles referenced below. That causes the keys, and the fobs that hang off the keys, to hang so low in the GM vehicles that the drivers' knees can easily bump them and inadvertently shut down the vehicle.

8.      As used in this complaint, the "Defective Vehicles" refers to the GM vehicles sold in the United States that have defective ignition switches, defective power steering; defective airbags, defective seatbelts, and/or defective powertrains, including the following makes and model years:

- 2002   Saturn SC2

9.      Because of defects in their design, manufacture, and/or assembly, the ignition switch installed in the Defective Vehicles are, by their nature, loose and improperly positioned and are susceptible to failure during normal and expected conditions. The ignition module is located in a position in the vehicle that allows a driver to contact the key ring, and inadvertently switch the ignition position.

10.     Because of its faulty design and improper positioning, the ignition switch can unexpectedly and suddenly move from the "on" or "run" position while the vehicle is in operation to the "off" or "accessory" position (the "Ignition Switch Defect"), which can occur at any time during normal and proper operation of the Defective Vehicles, meaning the ignition can suddenly switch off while it is moving at 65 mph on the freeway, leaving the driver unable to control the vehicle.

11.     GM installed these defective ignition switch systems in models from at least 2000 through at least 2012.  GM promised that these vehicles would operate safely and reliably.  This promise turned out to be false in several material respects.  In reality, GM concealed and did not fix a serious quality and safety problem plaguing its vehicles.

12.     More importantly, the Ignition Switch Defect in GM's vehicles could have been easily avoided.  From at least 2005 to the present, GM received reports of crashes and injuries that put GM on notice of the serious safety issues presented by its ignition switch system.

13.     New GM has acknowledged that the Ignition Switch Defect has caused at least thirteen deaths.  New GM has refused, however, to disclose the identities of those it counts among these thirteen deaths.  Independent safety regulators have recorded 303 deaths associated with only the Saturn Ion and Chevrolet Cobalt Defective Vehicle models due to the Ignition Switch Defect. The actual number of deaths for all Defective Vehicle models is expected to be much higher, especially considering the Feinberg numbers of over 100.

14.     Despite the dangerous nature of this defect and its effects on critical safety systems, New GM concealed its existence and did not disclose to consumers that its vehicles – which GM for years had advertised as "safe" and "reliable" – were in fact neither safe nor reliable.

15.     New GM has now also acknowledged further defective ignition switches, defect airbags, defective power steering, defective seatbelts as well as defective powertrains in one or more of these vehicles.

16.     This case arises from the serious and permanent injuries of JACQUELINE BROWN; as a result of New GM's breach of its obligations and duties, including New GM's failure to disclose that, as a result of the Defects, at least 10 million or more New GM vehicles (and almost certainly more, including the vehicles complained of herein) may have or did have the propensity to shut down during normal driving conditions creating an extreme and unreasonable risk of accident, serious bodily harm, and death.

17.     Many of the Defective Vehicles were originally designed, manufactured, marketed, and placed into the stream of commerce by GM's predecessor. GM's predecessor, General Motors Corporation (referred to as "Old GM") also violated these obligations and duties by designing and marketing vehicles with defective ignition switch systems, and then

by failing to disclose that defect even after it became aware that the ignition switch defect was causing fatal accidents.  In addition to the liability arising out of the statutory obligations assumed by New GM, New GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because New GM has continued the business enterprise of Old GM with full knowledge of the Ignition Switch Defects.

18.     New GM's predecessor, Old GM filed for bankruptcy in 2009.  In July 2009, the bankruptcy court approved the sale of GM's predecessor to GM.  Notwithstanding the prior bankruptcy or contractual obligations under the sale agreement, New GM is liable for its own conduct.  From its inception in 2009 and while extolling the safety and reliability of its vehicles, New GM had its own independent knowledge of the defects in its vehicles, yet chose to conceal them.

19.    Specifically, New GM has actual knowledge that, because of the way in which the ignition was designed and integrated into the Defective Vehicles, the ignition switch can suddenly fail during normal operation, cutting off engine power and certain electrical systems in the cars, which, in turn, disables key vehicle components, safety features (like airbags), or other vehicle functions, leaving occupants vulnerable to crashes, serious injuries, and death.

20.    Although New GM had, and has had, actual knowledge of safety defects in the Defective Vehicles for years, they fraudulently concealed and continue to fraudulently conceal material facts regarding the extent and nature of safety defects in the Defective Vehicles and what must be done to remedy the defects.

21.    New GM has not only fraudulently concealed material facts relating to the safety defects in the Defective Vehicles for years, but it has also made affirmative fraudulent

and misleading statements, and it is continuing to make fraudulent and misleading statements to the public and to Plaintiff regarding the nature and extent of the safety defects in the Defective Vehicles.

22.    Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"),[1] and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defect.[2] If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect.[3]

23.    New GM also violated the TREAD Act by failing to timely inform NHTSA of the ignition switch defects and allowed cars to remain on the road with these defects.  These same acts and omissions also violated various State consumer protection laws as detailed below.

24.    Upon information and belief, prior to the sale of the Defective Vehicles, New GM knew of the Ignition Switch Defect through sources such as pre-release design, manufacturing, and field testing data; in-warranty repair data; early consumer complaints made directly to New GM, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI") and/or posted on public online vehicle owner forums; field testing done in response to those complaints; aggregate data from New GM dealers; and accident data. Yet, despite this knowledge, New GM failed to disclose and actively concealed the Ignition Switch Defect from Plaintiff and the public, and

---

[1]      49 U.S.C.§§ 30101-30170
[2]      49 U.S.C. § 30118(c)(l) & (2).
[3]      49 U.S.C. § 30118(b)(2)(A) & (B)

continued to market and advertise the Defective Vehicles as reliable and safe vehicles, which they are not.

25.    In addition to the ignition switches, it is now believed that the faulty wiring system in the ignition switches also created the defective airbags and defective power steering, and that these defects resulted in the injuries and damages complained of herein.

26.    Plaintiff was also damaged by the acts and omissions of Old GM for which GM is liable through successor liability.

**PARTIES**

27.    JACQUELINE BROWN is a resident of Purves, Mississippi.

28.    General Motors Corporation (Old GM) was a Delaware corporation with its headquarters in Detroit, Michigan. The Corporation through its various entities designed, manufactured, marketed, distributed and sold Pontiac, Saturn, Chevrolet and other brand automobiles in Michigan, the State of Texas, and multiple other locations in the United States and worldwide.

29.    In 2009, General Motors Corporation ("Old GM") filed for bankruptcy, and substantially all of its assets were sold pursuant to a Master Sales and Purchase Agreement ("Agreement") to General Motors LLC ("New GM")

30.    Under the Agreement, General Motors LLC ("New GM")also expressly assumed certain liabilities of Old GM , including certain statutory requirements:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.

In addition, New GM expressly set forth that it:

> shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [General Motors Corporation] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.

31.     Because New GM acquired and operated Old GM and ran it as a continuing business enterprise, and because New GM was aware from its inception of the Ignition Switch Defects in the Defective Vehicles, New GM is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint.

32.     General Motors LLC (New GM) is a Delaware corporation with its headquarters in Detroit, Michigan.  General Motors LLC is registered with the Secretary of State and conducts business in all fifty states (including the District of Columbia).  GM was incorporated in 2009 and on July 10, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

33.     At all times relevant herein, General Motors Corporation (Old GM) and its successor in interest General Motors LLC (New GM) were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Defective Vehicles, and other motor vehicles and motor vehicle components throughout the United States.

34.     New GM is referred to in this Complaint as "Defendant".

35.     Among many others, the Liabilities assumed by New GM under the Agreement include:

(vii)(A) all Liabilities arising under express written warranties of Sellers [i.e., old GM] that are specifically identified as warranties and delivered in connection with sale of new, certified used or pre-owned vehicles or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmission) manufactured or sold by Sellers or Purchaser [i.e., new GM] prior to or after the Closing and (B) all obligations under Lemon Laws; ...

(ix) all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents, or other distinct or discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance; ...[4]

(xi) all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing; ...

36.     Plaintiff does not concede that New GM did not assume Old GM's liabilities for punitive damages.  But, as that question is sure to be taken up in ongoing and protracted litigation and on appeal, Plaintiff amends his Complaint to confirm that in this Action, Plaintiff is only seeking punitive damages for the conduct of New GM after July 2009.

37.     Moreover, the Bankruptcy Court order approving the Agreement made clear that New GM assumed "the warranty and recall obligations of both Old GM and [Defendant GM]."

38.     Pursuant to the Agreement and other orders of the Bankruptcy Court, New GM emerged out of bankruptcy and continued the business of Old GM with many, if not most, of Old GM's employees and, on information and belief, with most of the same senior-legal management, officers, and directors, documents, knowledge, data, files and testing.

---

[4] Pursuant to an order of the bankruptcy court, this particular category of assumed liabilities is "regardless of when the product was purchased."

## JURISDICTION AND VENUE

39.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00 and Plaintiff is a citizen of a different state than Defendant.

40.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendant, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, Defendant transacts business within the District, and some of the events establishing the claims arose in this District.

## FACTUAL ALLEGATIONS

### *The Defective Vehicles*

41.     The Chevrolet Cobalt was a compact car introduced in the United States in 2004 for the 2005 model year.

42.     Upon information and belief, New GM promoted these Defective Vehicles as safe and reliable in numerous marketing and advertising materials.  New GM has issued recalls on this 2005 Chevrolet Cobalt, including, but not limited to, Ignition Switch recalls and Power Steering recalls.

### *GM Field Reports and Internal Testing Reveal a Problem*

43.     In 2001, during pre-production of the 2003 Saturn Ion, Old GM engineers learned that the ignition switch could unintentionally move from the "run" position to the "accessory" or "off" position. In an internal report generated at the time, Old GM identified the cause of the problem as "low detent plunger force." The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating from one setting to another

unless the driver turns the key. The report stated that than an "ignition switch design change" was believed to have resolved the problem.

44.     In 2003, a second report documented an incident with a Saturn Ion where "a service technician observed a stall while driving." There the technician noted that the owner had several keys on the key ring and surmised that the "weight of the keys had worn out the ignition switch" and replaced the switch and closed the matter.

45.     Old GM engineers encountered the problem again in 2004 just prior to the launch of the 2005 Chevrolet Cobalt.  Old GM learned of an incident in which a Cobalt vehicle suddenly switched out of the "run" position and lost engine power.  Old GM engineers were able to replicate this problem during test drives of the Cobalt. According to Old GM, an engineering inquiry known as a Problem Resolution Tracking System ("PRTS") was able to pinpoint the problem and evaluate a number of solutions; however, after considering "lead time required, cost, and effectiveness," Old GM decided to do nothing.

46.     After the Chevrolet Cobalt entered the market in 2004, Old GM began receiving complaints about incidents of sudden loss of engine power.  Old GM engineers determined that the low torque in the ignition switch could cause the key to move from the "run" to the "accessory" or "off" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing key to be cycled to off position inadvertently." Specifically, in February 2005, Old GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the ignition switch . . . [and a] low position of the lock module [on] the [steering] column."

47.     Additional PRTSs were opened to investigate the problem, and in May 2005, GM engineers proposed redesigning the key head from a "slotted" to a "hole" configuration to prevent inadvertent shifting of the key in the ignition.  Although Old GM initially approved the design, the company once again declined to act.

48.     In testimony April 1, 2014, before the House Committee on Energy and Commerce, New GM CEO Mary Barra explained that the proposed "fix" for the Ignition Switch Defect was rejected in 2005 because it would have taken too long and cost too much.  Ms. Barra testified that New GM's decision-making was the product of a "cost culture" versus a "culture that focuses on safety and quality."

49.     In April 2006, Old GM finally approved a design change for the Chevrolet Cobalt's ignition switch.  According to Old GM, the changes included a new detent plunger and spring, but there was no corresponding change in the ignition switch part number.  New GM estimates that the redesigned ignition switch was produced for all Subject Vehicles during the 2007 model year.  On information and belief, this redesigned ignition switch did not cure the defect in the original switch and also did not meet design specifications.

50.     The newly designed switch and the faulty ignition switch both had the same part number assigned to them.  Upon information and belief, this action was intended to make it difficult to trace the defective switch back to its original design in 2001.

51.     After another PRTS in 2009, New GM redesigned the Chevrolet Cobalt key, changing the top of the key from a "slot" design to a "hole" design—as had been suggested in 2005. New GM instituted the change after finding that consumers "with substantially weighted key chains/additional keys hanging from ignition key have experienced accidental ignition shut-off" and the design change was intended to "significantly reduce downward

force and the likelihood of this occurrence." The new key design was produced for the 2010 model year. On information and belief, this redesigned ignition switch did not cure the defect in the original switch and also did not meet design specifications.

52.     The component required to fix the Ignition Switch Defect costs approximately $2 to $5. New GM management estimated that replacement components would cost an additional 90 cents per vehicle, but would only save 10 to 15 cents in warranty costs.

53.     New GM also now acknowledges that Field Product Reports and PRTS reports related to the Subject Vehicles from 2003 and 2006 concerned engine stalling in the Saturn Ion and may be related to the Ignition Switch Defect.

*GM Issues Information Service Bulletins*

54.     In 2005, as a result of internal investigation, Old GM issued an Information Service Bulletin entitled the "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007) to Old GM dealers warning about a stalling problem related to inadvertent shifting of the ignition switch. The bulletin applied to 2005 and 2006 Chevrolet Cobalt, 2006 Chevrolet HHR, 2005 and 2006 Pontiac Pursuit (Canada only), 2006 Pontiac Solstice, and 2003 to 2006 Saturn Ion, which all had the same ignition switch.

55.     The bulletin advised that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort," noting that risk was greater "if the driver is short and has a large and/or heavy key chain" such that "the driver's knee would contact the key chain while the vehicle was turning." Old GM dealers were told to inform consumers of this risk, and recommend "removing unessential items from their key chain." The bulletin also informed dealers that Old GM had developed an insert for the

13

key ring so that "the key ring cannot move up and down in the slot any longer – it can only rotate on the hole" and that the key ring has been replaced by a smaller design such that "the keys [will] not hang[ ] as low as in the past."

56.     On July 19, 2005, the New York Times reported that Chevrolet dealers were telling Cobalt owners to remove extra items from their key rings to prevent accidental stalling of their vehicles.  Alan Adler, Old GM's Manager for Safety Communications, stated that the problem manifested in only "rare cases when a combination of factors is present." Adler advised that consumers "can virtually eliminate this possibility by taking several steps, including removing nonessential material from their key rings."

57.     The Times reporter noted that his wife had already encountered the problem with the Chevrolet Cobalt: she was driving on a freeway, accidentally bumped the steering column with her knee, and found the engine "just went dead."  She was able to safely coast to the side of the road.  When the vehicle was brought back to the Chevrolet dealer for an inspection, nothing was found wrong and they were advised of the service bulletin. The reporter stated that the key chain being used at the time of the stalling incident was provided by Old GM, and included only the key fob and a tag.

58.     Old GM, in a statement at the time through Adler, insisted that this problem was not a safety issue because "[w]hen this happens, the Cobalt is still controllable" and the "engine can be restarted after shifting to neutral." Adler also claimed that this ignition issue was widespread because "practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition...."

59.     In October 2006, Old GM updated the Information Service Bulletin, "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs"

(#05-02-35- 007A) to include additional vehicles and model years.  Specifically, Old GM included the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, the 2007 Pontiac Solstice, the 2007 Saturn Ion, and the 2007 Saturn Sky. The updated bulletin included the same service advisories to GM dealers as the earlier version.

60.    According to New GM, the service bulletin was the appropriate response "given that the car's steering and braking systems remained operational even after a loss of engine power." New GM reports that GM dealers provided 474 key inserts to GM vehicle owners who brought their vehicles in for servicing.

### Reports of Unintended Engine Shut Down

61.    A number of reports from warranty and technical assistance data beginning in 2003, "addressed complaints of stalling Ion vehicles." Despite these reports, the Saturn Ion remained in production until 2007.

62.    On May 26, 2005, a reporter for The Daily Item in Sunbury, Pennsylvania reviewed the Chevrolet Cobalt and found that during his test drives of the vehicle there were "[u]nplanned engine shutdowns [that] happened four times during a hard-driving test week" with the vehicle.

### Crash Reports and Data

63.    The Defendant knew of the Ignition Switch Defect and its deadly consequences for consumers, but concealed that information from safety regulators and the public.

64.    National Highway Traffic Safety Administration (NHTSA) data shows that there were three fatal car crashes involving Saturn Ions due to a failure of the airbag to deploy prior to July 2005.

65.     In July 2005, a sixteen-year old was killed when her 2005 Chevrolet Cobalt crashed with the ignition switch in the accessory mode, which disabled the airbag.

66.     In 2006, there were at least two fatalities associated with a Chevrolet Cobalt crash. Information from the car's data recorder indicated that the ignition switch was in "accessory" instead of run, and the front airbags failed to deploy.

67.     In 2007, Old GM reviewed available sensor data from nine front-impact Cobalt crashes where the airbags did not deploy.  Old GM discovered that in four of the crashes, the ignition was in the "accessory position." Crash information for the other Subject Vehicles was not reviewed.

68.     In 2007, NHTSA's early warning division reviewed available data provided by Old GM on airbag non-deployments in Chevrolet Cobalt vehicles.  This review identified 43 incidents in which airbags may not have deployed in a crash.  The early warning division referred the case to NHTSA's data analysis division for further screening. A defects panel was convened, but after reviewing the data and consulting with Old GM, the panel ultimately concluded that "[t]he data available at the time of this evaluation did not indicate a safety defect or defect trend that would warrant the agency opening a formal investigation." In prepared remarks delivered April 1, 2014, to the Committee on Energy and Commerce, NHTSA Acting Administrator David Friedman stated, "At the time of these reviews, NHTSA did not have the information that New GM has since provided—for instance, new evidence linking airbag non-deployment to faulty ignition switches."

69.     New GM has identified 23 frontal-impact crashes in the United States involving 2005 to 2007 Chevrolet Cobalts and 2007 Pontiac G5s in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy.

16

70.     New GM has identified 8 frontal-impact crashes in the United States involving 2003 to 2007 Saturn Ion vehicles in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy.  These crashes resulted in four fatalities and six injuries to occupants.

71.     New GM has identified 3 frontal-impact crashes in the United States involving 2006 and 2007 model year Chevrolet HHR vehicles in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy.  These crashes resulted in three injuries to occupants.

72.     The Chevrolet Cobalt involved in this case had recalls involving similar issues to all of the vehicles described above, and it is believed that one or more of the defects with either the ignition switch, airbags or power steering was the proximate cause of this accident.

### NEW GM CONTINUES TO FRAUDULENTLY CONCEAL THE IGNITION SWITCH DEFECT AFTER THE BANKRUPTCY SALE

73.     New GM continued its business with the full knowledge of Old GM's awareness and concealment of the defects with the ignition switch and airbag system, and with knowledge of Old GM's failure to disclose those defects to the public – or, for that matter, to the Bankruptcy Court.  Had New GM acted when it acquired knowledge of the ignition switch defect, Plaintiff would likely not have been involved in an accident and sustained severe and permanent bodily injuries.

74.     Rather than promptly recalling the Subject Vehicles, however, New GM fraudulently concealed the existence of the safety defects in the Subject Vehicles.  Moreover, New GM continued to manufacture vehicles with the ignition switch defect after it emerged

from bankruptcy.  Indeed, hundreds of thousands of the vehicles manufactured by New GM have since been recalled for defective ignition switches.

75.    In March 2010, New GM recalled nearly 1.1 million Cobalt and Pontiac G5 models for faulty power steering issues. In recalling these vehicles, New GM recognized that loss of power steering, standing alone, was grounds for a safety recall. Yet, incredibly, New GM claims it did not view the ignition switch defect (which disables power steering as well as other functions) as a "safety issue," but only a "customer convenience issue." Despite its knowledge of the ignition switch defect, New GM did not include the ignition switch defect in this recall. Further, although the Chevrolet HHR used the same steering system as the Cobalt and Pontiac (and had the same ignition switch defect), New GM did not recall any Chevrolet HHR vehicles at this time.

76.    Just days after the power steering recall, New GM's deadly ignition switch took another life. On March 10, 2010, Brooke Melton was driving her 2005 Chevrolet Cobalt on a two-lane highway in Paulding County, Georgia. While she was driving, her key turned from the "run" to the "accessory/off" position causing her engine to shut off. After her engine shut off, she lost control of her Cobalt, which traveled into an oncoming traffic lane, where it collided with an oncoming car. Ms. Melton was killed in the crash.  New GM received notice of this crash.  The deaths did not stop here.

77.    On December 31, 2010, in Rutherford County, Tennessee, a 2006 Cobalt traveled off the road and struck a tree. Although there was a frontal impact in this incident, the front airbags failed to deploy. The download of the SDM later showed the key was in the "accessory/off" position at the time of the crash. New GM received notice of this incident, opened a file, and referred to it as the "Chansuthus" incident.

78.     Also on December 31, 2010, in Harlingen, Texas, a 2006 Cobalt traveled off the road and struck a curb. Although there was a frontal impact, the front airbags failed to deploy. New GM received notice of this incident, opened a file, and referred to it as the  Najera" incident.

79.     On March 22, 2011, Ryan Jahr, a New GM engineer, downloaded the SDM from Brooke Melton's Cobalt. The information from the SDM download showed that the key in the  Cobalt turned from the "run" to the "accessory/off" position 3-4 seconds before the crash. On  June 24, 2011, Brooke Melton's parents filed a lawsuit against New GM.

80.     In August 2011, New GM assigned Engineering Group Manager Brian Stouffer to assist with a Field Performance Evaluation (FPE) that it had opened to investigate frontal airbag  non-deployment incidents in Chevrolet Cobalts and Pontiac G5s.

81.     On December 18, 2011, in Parksville, South Carolina, a 2007 Cobalt traveled off the road and struck a tree.  Although the vehicle sustained a frontal impact, the front airbags did  not deploy. A subsequent download of the SDM showed that the ignition key was in the "accessory/off" position at the time of impact. New GM received notice of this incident, opened a file, and referred to it as the "Sullivan" incident.

82.     In early 2012, Brian Stouffer asked Jim Federico (who reported directly to Mary  Barra at the time) to oversee the FPE investigation into frontal airbag non-deployment incidents.  Federico was named the "executive champion" for the investigation to help coordinate resources.

83.     In May 2012, New GM engineers tested the torque on numerous ignition switches of 2005-2009 Cobalt, 2007-2009 Pontiac G5, 2006-2009 HHR, and 2003-2007 Ion vehicles that  were parked in a junkyard. The results of these tests showed that the torque

required to turn the  ignition switches from the "run" to the "accessory/off" position in most of these vehicles did not  meet Old and New GM's minimum torque specification requirements. Even vehicles from model years 2008-2009, after Ray DeGiorgio approved the redesign of the ignition switch, by and large  failed to meet Old and New GM's torque specifications. These results were reported to Stouffer and other members of the FPE.

84.     In September 2012, Stouffer requested assistance from a "Red X Team" as part of  the FPE investigation. The Red X Team was a group of engineers within GM assigned to find the  root cause of the airbag non-deployments in front-end accidents involving Chevrolet Cobalts and Pontiac G5s. By that time, however, it was clear that the root cause of the airbag non-  deployments in a majority of the front-end accidents was the defective ignition system.

85.     Indeed, Mr. Stouffer acknowledged in his request for assistance that the Chevrolet  Cobalt could experience a power failure during an off road event, or if the  driver's knee  contacted the key and turned off the ignition. Mr. Stouffer further acknowledged that such a loss  of power could cause the airbags not to deploy. In other words, Mr. Stouffer knew full well the  reasons for the airbag non-deployments, yet he requested additional assistance in order to stall  and/or ignore the problem.

86.     At this time, New GM did not provide the information that it had developed during the FPE to NHTSA or the public.

87.     Under 49 C.F.R. § 573.6, New GM had a duty in 2012, when it clearly was aware of the ignition switch defect, to disclose the defect in the Subject Vehicles. Rather than comply  with its legal obligations, New GM continued to fraudulently conceal this defects from the public and the US government.

88.     Had New GM complied with its obligations under § 573.6, a recall may have been implemented and prevented this accident.

89.     Acting NHTSA Administrator David Friedman recently stated, "at least by 2012, New GM staff was very explicit about an unreasonable risk to safety" from the ignition switches in the Subject Vehicles.

90.     Mr. Friedman continued: "New GM engineers knew about the defect. [New] GM lawyers knew about the defect. But [New] GM did not act to protect Americans from the defect."

91.     There is significant evidence that multiple in-house attorneys knew of and understood the ignition switch defect in and around 2012 and 2013. These attorneys, including in-house lawyer Michael Milliken, negotiated settlement agreements with families whose loved ones had been killed and/or injured while operating a Subject Vehicle under circumstances that implicated the ignition switch defect. In spite of their knowledge of the ignition switch defect, New GM's attorneys concealed what they knew and neglected to question whether the Subject Vehicles should be recalled. This quest to keep the ignition switch defect secret prolonged its ultimate discovery and contributed to added death and injury.

92.     During the FPE inquiry, New GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key would inadvertently move from the "run" to the "accessory/off" position, it would not be a total solution to the problem.

93.     Indeed, New GM engineers identified several additional ways to actually fix the problem. Unsurprisingly, these solutions echoed solutions that Old GM engineers had

proposed  years before, but had decided not to implement because of cost concerns. New

GM engineers proposed adding a shroud to prevent a driver's knee from contacting the key,

modifying the key  and lock cylinder to orient the key in an upward facing orientation

when in the "run" position,  and adding a push button to the lock cylinder to prevent it

from slipping out of run. New GM rejected each of these ideas.

94.     The photographs below depict a New GM engineer in the driver's seat of a

Cobalt during the investigation of Cobalt stalling incidents. Note the proximity of the

driver's knee to  the ignition key:



95.     These photographs show the dangerous position of the key in the lock

module on the steering column, as well as the key with the slotted head, which allows the

key fob to hang  too low off the steering column. New GM engineers understood that the

key fob can be impacted and pinched between the driver's knee and the steering column,

and that this may cause the key  to inadvertently turn from the "run" to the "accessory" or

"off" position. The photographs show why New GM engineers understood that increasing

the detent in the ignition switch would not be a total solution to the problem, for such a step

would not alleviate the possibility of impacting the  key  with  a  driver's  knee.  The

photographs also show why New GM engineers believed that additional changes (such as the shroud) were necessary to fully fix the defects with the ignition  switch.

96.     On October 4, 2012, there was a meeting of the Red X Team during which Jim Federico gave an update of the Cobalt airbag non-deploy investigation. According to an email  from Stouffer on the same date, the "primary discussion was on what it would take to keep the  SDM active if the ignition key was turned to the accessory mode." Again, New GM engineers recognized that the SDM should remain active if the key is turned to the "accessory/off" mode,  but GM took no action at this time to remedy the ignition switch defect or notify customers that  the defect existed.

97.     During the October 4, 2012 meeting, Stouffer and the other members of the Red  X Team also discussed "revising the ignition switch to increase the effort to turn the key from  Run to Accessory."

98.     On October 4, 2012, Mr. Stouffer emailed Ray DeGiorgio and asked him to "develop a high level proposal on what it would take to create a new switch for service with  higher efforts." On October 5, 2012, DeGiorgio responded:

> Brian,
>
> In order to provide you with a HIGH level proposal, I need to understand   what my requirements are. what is the TORQUE that you desire?  Without this information I cannot develop a proposal.

99.     On October 5, Stouffer responded to DeGiorgio's email, stating:

> Ray,

23

As I said in my original statement, I currently don't know what the torque value needs to be. Significant work is required to determine the torque.  What is requested is a high level understanding of what it would take to  create a new switch.

100.     DeGiorgio replied to Stouffer the following morning:

Brian, Not knowing what my requirements are I will take a SWAG at the Torque  required for a new switch. Here is my level proposal

**Assumption is 100 N cm Torque.**

- New switch design = Engineering Cost Estimate approx. $300,000
- Lead Time = 18 – 24 months from issuance of GM Purchase Order and supplier selection.

Let me know if you have any additional questions.

101.     Stouffer later admitted in a deposition that DeGiorgio's reference to "SWAG" was an acronym  for "Silly Wild-Ass Guess."

102.     DeGiorgio's cavalier attitude exemplifies New GM's approach to the safety-related defects that existed in the ignition switch and airbag system in the Subject Vehicles.  Rather than seriously addressing the safety-related defects, DeGiorgio's emails show he  understood the ignition switches were contributing to the crashes and fatalities, and  he simply could not care less.

103.     It is also obvious from this email exchange that Stouffer, who was a leader of the Red X Team, had no problem with DeGiorgio's cavalier and condescending response to  the  request that he evaluate the redesign of the ignition switches.

104.     On April 29, 2013, Ray DeGiorgio was deposed in Detroit, Michigan as part of the lawsuit brought by Brooke Melton's parents. At his deposition, Mr. DeGiorgio was shown  photographs of the differences between the ignition switch in Brooke's Cobalt and

the ignition  switch in the 2008 Cobalt (which DeGiorgio had redesigned without changing the part number).

105.    Mr. DeGiorgio was  questioned  about  his  knowledge  of any  differences  in the  ignition switches:

> Q.      And I'll ask the same question. You were not aware before today that GM had  changed the spring – the spring on the ignition switch had been changed from '05  to the replacement switch?

> MR. HOLLADAY: Object to the form. Lack of predicate and foundation. You can answer.

> THE  WITNESS: I was not aware of a detent plunger switch change. We certainly  did not approve a detent plunger design change.

> Q.      Well, suppliers aren't supposed to make changes such as this without GM's  approval, correct?

> A.      That is correct.

> Q.      And you are saying that no one at GM, as far as you know, was aware of this  before today?

> MR. HOLLADAY: Object. Lack of predicate and foundation. You can answer.

> THE WITNESS: I am not aware about this change.

(DeGiorgio Depo at 151-152.)

106.    Mr. DeGiorgio's testimony left  no  doubt  that  he  unequivocally  disclaimed any   knowledge  of  any  change  in  the  ignition  switch  in  the  2005-2010  Cobalts.  Mr. DeGiorgio,  however, authorized the  redesign to the ignition  switches in 2006. Thus, the testimony provided  in 2013 was knowingly false and intended to mislead.

107.   Mr. DeGiorgio also provided the following testimony about the ignition switch supplier, Delphi:

> Q.   And there weren't any changes made – or were there changes made to the  switch between '05 and 2010 that would have affected the torque values to move  the key from the various positions in the cylinder?
>
> A.   There was one change made to the resistor in '08, but that should not have  affected the torque or the displacement of the switch.
>
> I can restate this way: There was an electrical change made in '08, but not a  mechanical change – at least there were no official changes, mechanical changes,  made to the switch that I know of.
>
> Q.   When you say no official, could there be unofficial changes made?
>
> A.   I'm not saying that there was, I'm just saying if there was something changed  at the supplier side, we were not aware of it and we did not approve it, okay?

(DeGiorgio Depo at 57-58).

108.   Mr. DeGiorgio's testimony left no doubt that he had spoken with Delphi employees and that they confirmed that there were no changes made to the ignition switch in  2005-2010 Cobalts. This testimony, like the testimony set forth above, was knowingly false and  intended to mislead.

109.   New GM's years-long internal "investigation" into the Subject Vehicles—as well as all  of  the Old GM documents that were included in the "Purchased Assets" from the bankruptcy sale—provided New GM with actual knowledge, long before Plaintiff's injury, of the ignition switch defects in the Subject Vehicles. Notwithstanding these  facts, New GM continued to fraudulently conceal the nature and extent of the defects from the public, inducing customers, including Dennis Ward, to purchase Subject Vehicles with no

knowledge of the existence of these serious and uniform defects, and no provision to avoid the  safety risks of operating the Subject Vehicle. Mr. DeGiorgio's deposition testimony in 2013,  while appalling, is simply emblematic of the cover-up that was long-running and company-wide.

110.    Moreover, throughout the entirety of its corporate existence, New GM received numerous and repeated complaints of moving engine stalls and/or power failures in the Subject  Vehicles. These complaints are yet more evidence that New GM was fully aware of the ignition switch defect and should have timely announced a recall much sooner than it did.

111.    New GM  was aware of these problems year after year and nationwide, as reflected not only by the internal documents reflecting knowledge and cover-up at high levels,  but also in thousands of customer complaints recorded in GM's internal complaint logs and  documents. GM received and reviewed complaints of safety issues from customers with Subject   Vehicles in nearly every state nationwide. Documents produced by GM pursuant to Order No. 12  in *In re General Motors LLC Ignition Switch Litigation* (14-MC-2543, Dkt. No. 46) show that GM was aware of customer complaints of stalling Subject Vehicles in many of these states and  ultimately did nothing about them. These complaints, of course, are in addition to the multiple  non-deploy fatalities of which New GM became aware and even investigated from July 2009 to the present.

**NEW GM ISSUES A RECALL – TEN YEARS TOO LATE**

112.    As pressure from the Melton litigation mounted, New GM executives finally felt compelled  to  act.  On  January  31,  2014,  New  GM's  Field  Performance  Review

Committee and Executive Field Action Decision Committee ("EFADC") finally ordered a recall of some Subject Vehicles.

113.    On February 7, 2014, New GM, in a letter from Director of Product Investigations and Safety Regulations Carmen Benavides, informed NHTSA that it was conducting a recall of 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles.

114.    New GM knew that this recall was insufficient in scope. Indeed, New GM knew that the same defective ignition switches installed in the Cobalt and G5 vehicles were installed in Chevrolet HHR, Pontiac Solstice, Saturn Ion, and Saturn Sky vehicles. But New GM did not recall these vehicles on February 7.

115.    On February 19, 2014, a request for timeliness query of New GM's recall was sent to NHTSA by The Cooper Firm.  The timeliness query pointed out that New GM had failed to recall all of the vehicles with the defective ignition switches.

116.    The February 19, 2014 timeliness query also asked NHTSA to investigate New GM's failure to fulfill its legal obligation to report the safety defects in the Subject Vehicles within five days of discovering the defect—a requirement of applicable federal law.

117.    On February 24, 2014, New GM informed NHTSA it was expanding the recall to include 2006-2007 model year Chevrolet HHR and Pontiac Solstice, 2003-2007 model year Saturn Ion, and 2007 model year Saturn Sky vehicles.

118.    New GM included an Attachment to the February 24, 2014 letter. In the Attachment, New GM, for the first time, admitted that it authorized a change in the ignition switch in 2006. Specifically, New GM stated:

On April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the  ignition  switch proposed by the supplier, Delphi Mechatronics. The approved  changes included, among other things, the use of a new detent plunger and  spring that increased torque force in the ignition switch. This change to the  ignition  switch  was  not  reflected  in  a corresponding change in the part  number for the ignition switch. GM believes that the supplier began  providing the re-designed ignition switch to GM at some point during the  2007 model year.

119.    Public criticism in the wake of New GM's piecemeal recalls was withering.  On March 17, 2014, Mary Barra issued an internal video, which was broadcast to employees. In the video, Ms. Barra acknowledged:

> Scrutiny of the recall has expanded beyond the review by  the  federal  regulators at NHTSA, the National Highway Traffic Safety Administration. As of now, two congressional committees have  announced that they will examine the issue. And it's been reported that the Department of Justice is looking into this matter. . . . These are serious developments that shouldn't surprise anyone. After all, something went  wrong with our process in this instance and terrible things happened.

120.    The public backlash continued and intensified. On March 28, 2014, New GM again expanded the ignition switch recall to cover all model years of the Chevrolet Cobalt and  HHR, the Pontiac G5 and Solstice, and the Saturn Ion and Sky in the United States. This third  expansion of the ignition switch recall covered an additional 824,000 vehicles in the United  States and raised the number of recalled vehicles to 2,191,146.  New GM's  recalls  of  the  Subject  Vehicles  were  not  only  untimely,  they  are completely insufficient to correct the safety-related defects in the Subject Vehicles.

121.    To address the safety defect, New GM is replacing the defective ignition switches in the Subject Vehicles with a new ignition switch, and providing new keys without slotted key  heads. These repairs fail to address the design defect that causes the

key fob/chain to hang too  low on the steering column, and fails to address the defective airbag system, which disables the  airbag immediately when the engine shuts down. Thus, even when the ignition switches and keys  are replaced, a defective condition will still exist in the Subject Vehicles and the potential will  continue to persist for a driver to contact the key chain and inadvertently turn the key from the  "run" to the "accessory/off" position.

122.    New GM notified owners and lessees of the Subject Vehicles by letter beginning in late February of 2014.

123.    On May 16, 2014, New GM  agreed to a civil penalty of $35 million—the maximum permitted by law—for its failure to timely notify NHTSA of the ignition switch defect. As part of its agreement, New GM agreed to implement numerous internal reforms to improve its response to product defect issues in the future.  New GM expressly admitted it violated the Safety Act.

124.    New GM later fired fifteen employees for their participation in the ignition switch cover-up. Two of those employees, Design Release Engineer Ray DeGiorgio and  Gary Altman, were intimately involved in the development—and concealment—of the defective ignition switches, and both were longtime employees of Old GM and New GM.

125.    In the months that followed the initial ignition switch recalls, New GM finally began to acknowledge that it has been ignoring safety concerns in its vehicles for years. To date, New GM has announced over 35 recalls since February 2014, and it has recalled  over  26.6 million vehicles in the past eight months. This number is staggering; indeed, no car manufacturer  has ever recalled as many vehicles in a single year.

<u>**FACTS SPECIFIC TO EACH PLAINTIFF**</u>

126.    On or about August 6, 2013, JACQUELINE BROWN was the driver of a 2002 Saturn SC2 (VIN 1G8ZY127X2Z286335), when suddenly and unexpectedly, the car went off the road, and the airbags failed to deploy despite significant front-end crush that should have deployed the bags.  This resulted in Ms. Brown suffering hip and back injuries.  The loss of steering due to sudden movement of the ignition switch and the airbags failure to deploy are the same issues Old GM and then New GM were well aware of for years and covered up from the public and NHTSA.

**CLAIMS FOR RELIEF**
**FIRST CLAIM FOR RELIEF**

**Negligence, Gross Negligence and Recklessness**

127.    Plaintiff adopts and incorporates by reference all prior paragraphs of the Complaint as if set out here in full.

128.    Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement, wherein New GM acquired certain Old GM assets, New GM acquired knowledge of Old GM's activities and the defective ignition switch and other defects via the minds of the employees, officers and managers it acquired through the Sale Order.  New GM acquired knowledge of Old GM's activities and the defective ignition switch and other defects via the books and records obtained and/or acquired as a result of the sale order.  Thus, the duties of Old GM are part of the foundation for New GM's liability.  Additionally, New GM's liability for damages is attributable to its own post-sale conduct.

129.    New GM owed Plaintiff and public a duty to design, manufacture, fabricate, assemble, inspect, market, distribute, sell, and/or supply products in such a way as to avoid harm to persons using them such as Plaintiff.

130.    New GM owed Plaintiff and the public a duty to detect known safety defects in GM vehicles.

131.    New GM owed Plaintiff and the public a duty, once it discovered the ignition switch defect, to provide thorough notice of the defect, including a warning that the defective vehicles should not be driven until an appropriate repair procedure is developed and performed.

132.    New GM owed Plaintiff and the public a duty, once it discovered the ignition switch defect, to ensure that an appropriate repair procedure was developed and made available to drivers.

133.    New GM knew that their customers and the public, such as Plaintiff, expect that the company will employ all reasonable efforts to detect safety defects, warn drivers of their existence, and develop and make available an appropriate repair procedure.

134.    New GM's efforts to discover, provide notice of, and provide repair procedures for safety related defects exist for the benefit of the Plaintiff, other passengers and drivers of GM vehicles.  New GM was aware that by providing maintenance and repair information and assistance, including through its authorized dealerships, Old GM and New GM had a responsibility to Plaintiff, other passengers and drivers to take the reasonable measures listed above.

135.    Independent of any failures by Old GM as described herein, between July 10, 2009 and March 2014, New GM breached its duties to the Plaintiff by failing to provide appropriate notice of and repair procedures for the ignition switch defect and other defects in the Plaintiff's vehicles.  In doing so, New GM departed from the reasonable standard of care required of it.

136.   It was foreseeable that if the New GM did not provide appropriate notice and repair procedures for the defect, the Plaintiff and other passengers and drivers would be endangered.

137.   The Plaintiff's injuries were reasonably foreseeable to New GM.

138.   Plaintiff could not through the exercise of reasonable diligence have prevented the injuries and death caused by New GM's negligence and gross negligence.

139.   Old GM and New GM's acts and omissions, when viewed objectively from the actor's standpoint, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  New GM nevertheless proceeded with conscious indifference to the rights, safety and welfare of others.

**SECOND CLAIM FOR RELIEF**
**Fraudulent Concealment**

140.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

141.   As set forth above, Defendant concealed and/or suppressed material facts concerning the safety of their vehicles from Plaintiff, the public and NHTSA.  New GM knew that the Defective Vehicles were designed and manufactured with defective ignition switches, defective airbags, defective power steering, defective seatbelts and defective powertrains, but GM concealed those material facts.

142.   Defendant had a duty to disclose these safety issues because they consistently marketed their vehicles as reliable and safe and proclaimed that Defendant maintains the highest safety standards.  Once Defendant made representations to the public about safety,

Defendant was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

143.    In addition, Defendant had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendant who has superior knowledge and access to the facts, and Defendant knew they were not known to or reasonably discoverable by Plaintiff. These omitted facts were material because they directly impacted the safety of the Defective Vehicles, namely the vehicle in which Plaintiff was a drivers resulting in serious and permanent injuries.  Whether or not a vehicle ignition switch will unexpectedly and suddenly move to the "off" or "accessory" position, thereby disabling power steering, anti-lock brakes and airbag deployment while the car is in motion, are material safety concerns.  Defendant possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

144.    Defendant actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce consumers to purchase Defective Vehicles that caused serious injury and death.

145.    Plaintiff was unaware of these omitted material facts and would not have entered into a Defective Vehicle as a passenger or driver if he had known of the concealed and/or suppressed facts.  Defendant was in exclusive control of the material facts concerning the Ignition Switch Defect and such facts were not known to the public.

146.    As a result of the concealment and/or suppression of facts, concerning the Ignition Switch, Airbags and the Power Steering, Plaintiff JACQUELINE BROWN sustained serious and permanent injuries and extreme pain and suffering subsequent to the accident.

147.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the public's rights and well-being to enrich Defendant.  Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**THIRD CLAIM FOR RELIEF**
**Fraud by Non-Disclosure**

148.    Plaintiff hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

149.    As early as 2001, during pre-production development of the Saturn Ion, Old GM became aware of issues relating to the ignition switch "passlock" system.  The 2001 report stated that the problem included a "low detent plunger force" in the ignition switch.

150.    In 2003, before the launch of the 2005 Cobalt, Old GM became aware of incidents wherein the vehicle engine would suddenly lose power in the event the key moved out of the "run" position when the driver inadvertently contacted the key or steering column. An investigation was opened and, after consideration of lead-time required and the cost and effectiveness of potential solutions, the investigation was closed with no action taken.

151.    As set forth above, from July 2009 to the present, New GM intentionally concealed or failed to disclose material facts from the Plaintiff, the public and NHTSA.

152.    Additionally, from its inception in 2009, New GM possessed independent knowledge of the defects in the Plaintiff's vehicles and the need to undertake multiple design

steps to resolve those defects to prevent injury and economic harm to vehicle owners such as Plaintiff.  This knowledge was based, in part, on the information from records, files, reports and other documents and materials regarding the defective ignition switch maintained by Old GM, all of which were included in the assets purchased by New GM during the bankruptcy sale.

153.    New GM had a duty to disclose the facts to the Plaintiff and New GM knew:  (1) that the Plaintiff was ignorant of the material facts that New GM did not disclose and/or intentionally concealed; and (2) the Plaintiff did not have an equal opportunity to discover the material facts that New GM did not disclose and/or intentionally concealed.  Old GM's fraud, fraudulent concealment and fraudulent non-disclosure were all components of the subject incident of the Plaintiff.  Because New GM acquired knowledge of Old GM's activities and the defective ignition switch as well as other defects via the minds of the employees, officers, managers, books and records obtained and/or acquired as a result of the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement and subsequent Sale Order, New GM is expressly liable to Plaintiff.  Further, the duties of Old GM are part of the foundation for the liability acquired by New GM.

154.    Independent of any failures by New GM as described herein, between July 10, 2009 and March, 2014, New GM breached its duties to the Plaintiff by failing to disclose knowledge of the defective ignition switch to Plaintiff.

155.    New GM had a duty to disclose the facts to the Plaintiff and New GM knew:  (1) that the Plaintiff was ignorant of the material facts that New GM did not disclose and/or intentionally concealed; and (2) the Plaintiff did not have an equal opportunity to discover the material facts that New GM did not disclose and/or intentionally concealed.

156.    By failing to disclose these material facts, New GM intended to induce the Plaintiff to take some action or refrain from acting.

157.    Plaintiff relied on New GM's non-disclosure and they were killed or injured as a result of acting without knowledge of the undisclosed facts.

### DAMAGES

158.    As a direct and proximate result of New GM's wrongful conduct, Plaintiff has been (and continues to be) damaged in the form of: (a) past and future pain and suffering; (b) past and future physical impairment; (c) past and future physical disfigurement; (d) past and future mental anguish; (e) past and future loss of consortium and/or loss of services; (f) past and future loss of income and/or lost earning capacity; (g) past and future reasonable and necessary medical expenses; and (h) past and future loss of enjoyment of life.  All of the damages sustained by Plaintiff were reasonably foreseeable by New GM, and exceed the minimum jurisdictional limits of this Court.  All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

### EXEMPLARY/PUNITIVE DAMAGES

159.    Plaintiff is also entitled to exemplary and punitive damages.

160.    The evidence referenced in this Complaint and the mounting evidence regarding the recent recalls of millions of defective GM vehicles makes it clear that New GM is guilty of exceptional misconduct. New GM was issued, and agreed to, a record fine by the U.S. Department of Transportation's National Highway Traffic Safety Administration. New GM has been aware for more than a dozen years that the ignition switches in the Subject Vehicles were grossly inadequate and subjected the driving public to a grave risk of grievous harm. Producing and marketing vehicles that are subject to complete system failures at

highway speeds is akin to launching millions of torpedoes onto American streets and highways – with unsuspecting consumers inside.  New GM knew about the problem for years and, because of greed and/or gross ineptitude, refused to act on the problem. Instead, New GM gave the issue the "GM nod." The "GM nod" demonstrates that more than one of New GM's superior officers in the course of employment ordered, ratified, and/or participated in the malicious conduct. These officers acted maliciously, wantonly, and/or recklessly, and clearly New GM is guilty of exceptional misconduct and gross negligence. Plaintiff demands punitive damages for this conduct.

161.    Plaintiff would further show that the clear and convincing evidence in this case will show that New GM consciously or deliberately engaged in oppression, fraud, wantonness, and/or malice in concealing the defect in the Subject Vehicles and failing to recall the vehicle in a timely manner.  New GM had actual, subjective awareness of the risk involved but nevertheless proceeded with indifference to the rights, safety, or welfare of others, including Plaintiff.  Therefore, punitive damages are sought and should be assessed against New GM.  Plaintiff does not in this Action seek punitive damages for the conduct of Old GM, but does not concede that New GM did not also assume liability for punitive damages.

## Pre-Judgment Interest and Post-Judgment Interest

162.    Lastly, Plaintiff is entitled to pre-judgment and post-judgment interest (to be determined).

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demand a trial by jury of any and all issues in this action so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendant as follows:

A.    an award to Plaintiff for actual damages, compensatory and exemplary damages, including interest, in an amount to be proven at trial;

B.    an award of costs, as allowed by law;

C.    an award of pre-judgment and post-judgment interest, as provided by law;

D.    leave to amend this Complaint to conform to the evidence produced at trial; and

E.    such other relief as may be appropriate under the circumstances.

Dated: August 3, 2016

RESPECTFULLY SUBMITTED,

*/s/ Mitchell A. Toups*
Mitchell A. Toups (TX Bar # 20151600)
WELLER, GREEN, TOUPS & TERRELL, LLP
2615 Calder Ave., Suite 400
Beaumont, TX 77702
Telephone: (409) 838-0101
Facsimile: (409) 832-8577
Email:  matoups@wgttlaw.com

James R. Dugan, II
Douglas R. Plymale
David B. Franco
THE DUGAN LAW FIRM, APLC
365 Canal Street, Suite 1000
New Orleans, Louisiana 70130
Telephone: (504) 648-0180
Facsimile: (504) 648-0181

Gregory K. Evans (TX Bar  No. 24002065)
Law Offices of Gregory K. Evans, PLLC
3900 Essex, Suite 690
Houston, TX  77027
(713) 840-1299
Facsimile:  (281) 254-7886
Email:  greg@gevanslaw.com

***Attorneys for Plaintiff***

CERTIFICATE OF SERVICE

     I hereby certify that a true and correct copy of the above and foregoing has been furnished to all counsel of record listed through this Court's e-file system on August 3, 2016.

/s/ Mitchell A. Toups<br>
Mitchell A. Toups